J-S28040-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| LUIS MIGUEL NAVEDO | : | |
| | : | |
| Appellant | : | No. 331 MDA 2022 |

Appeal from the Judgment of Sentence Entered May 16, 2014
In the Court of Common Pleas of Berks County
Criminal Division at No(s):  CP-06-CR-0002427-2013

BEFORE:  OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:               **FILED: JANUARY 20, 2023**

Appellant, Luis Miguel Navedo, appeals *nunc pro tunc* from the judgment

of sentence entered in the Berks County Court of Common Pleas, following his

jury trial convictions for first-degree murder, attempted first-degree murder,

aggravated assault, aggravated assault with a deadly weapon, and possession

of instruments of crime.[1]  We affirm.

The trial court set forth the relevant facts and procedural history of this

case as follows:

> September 2, 2012 was the Saturday before Labor Day and
> there was a large crowd that night at the Jet Set Bar &
> Restaurant in Reading, Berks County, Pennsylvania.  One
> bouncer reported to the police that more than 650 patrons
> had been at the nightclub.  As closing time approached in
> the early morning hours of September 3, 2012, people were

---

[1] 18 Pa.C.S.A. §§ 2502(a), 901(a), 2702(a)(1), 2702(a)(4) and 907(a),
respectively.

walking to Jet Set's parking lot when shots rang out and chaos ensued.

Reading Police Officers Adam J. Linderman and Mark Hackney were first to respond to the scene, having been assigned to a city-wide patrol that happened to find them blocks from the Jet Set Bar & Restaurant around 2 a.m. From approximately 10 yards from the entrance to the parking lot, Officer Linderman recalled hearing 6 to 7 shots fired. Officers Linderman and Hackney were quickly joined by Reading Police Officer Sneeringer. All three entered the parking lot "tactically," not sure of where the "threat" was at that point in time, nor who the victim or victims were. As Officer Linderman explained, "We didn't know if the shooter was still on location." In fact, additional shots were fired as the officers were arriving on the scene. Officer Sneeringer testified that when he arrived, he caught up to Officers Linderman and Hackney to form a tactical "stack" formation.

As the officers entered the parking lot, multiple people were fleeing: "people were screaming, some people were hysterical." The officers quickly located one apparent shooting victim in a car. Officer Sneeringer testified that he observed a burgundy Toyota SUV in the northwest corner of the parking lot. Officer Sneeringer made contact with Victim Mizraim Ortiz, who by then was standing outside of the passenger side of the Toyota SUV. Victim Jose Rivera was inside the vehicle, apparently bleeding to death.

The responding officers called for an ambulance and attempted to interview the victims, but they were unable to identify the shooter. Officer Sneeringer testified that Victim Jose Rivera told him it was "two Hispanic males" that had attacked him but was unable to provide more information. Ultimately, Victim Jose Rivera died as a result of the gunshot wounds inflicted in the parking lot of the Jet Set Bar & Restaurant and Victim Mizraim Ortiz sustained injuries from which he still suffered residual pain.

Although there had been a large number of people in the parking lot, few seemed to have witnessed the shooting. For example, Commonwealth Witness Mabel Pacheco had been at the Jet Set with two friends that evening. They were walking to the car of one friend, Ms. [Marianne] Marrero,

when the ladies heard gunshots. Ms. Pacheco estimated that the shots were fired from approximately 15 feet away, but she testified that she did not see the shooter. She recalled that she had been walking behind a group of people, who had been "loud" but she was reluctant to describe the interaction as an argument.

Commonwealth witness and surviving victim, Mizraim Ortiz, the former neighbor of deceased Victim Jose Rivera, testified that on September 2, 2012 the two men had been out for the evening together, first at an establishment called Rancho Merengue and then, later, at the Jet Set Bar &: Restaurant. At the Jet Set when walking to get drinks, Victim Mizraim Ortiz accidentally bumped into someone, which appeared to anger this other person. He stated that he "just bumped someone and it was a heated argument and [they said] we're going to wait for you outside." He further explained that the other guy "tried to be a tough guy or whatever, but I just let it go, but he was getting angry over it. I just said let it go and he said he's going to wait for me outside."

Victims Mizraim Ortiz and Jose Rivera left the bar approximately 45 minutes after this incident and went into the parking lot. Victim Mizraim Ortiz testified that he had gotten into his car, turned it on, and then heard gunshots. Victim Jose Rivera was in the passenger side of the car, and Victim Mizraim Ortiz testified that he didn't realize at the time that they both had been shot. Victim Mizraim Ortiz got out of the car and came around to the passenger side where Victim Jose Rivera was on the floor. He did not see who had shot them, nor did he see anyone outside when he got out of the car. On cross-examination, Victim Mizraim Ortiz recalled telling the police that the person he had bumped into earlier inside the Jet Set was a Hispanic male, but at trial he denied telling the police that the man he had bumped into had long hair, or at least did not recall telling the police that the shooter had long hair.

Despite the confusion and uncertainty at the scene immediately following the shooting, there was one eye-witness at trial who conclusively identified Appellant as the shooter. This witness's name is Johnny Ayala-Ocasio, who had contacted the Reading police via letter indicating that

he had information about the shooting. The police interviewed Mr. Ayala-Ocasio in December of 2012. At trial, Mr. Ayala-Ocasio testified that on September 3, 2012, he saw his childhood friend Jose Rivera-Aguirre[8] at the Jet Set Bar & Restaurant with a man known to him as "Menor" (identified as Appellant). Mr. Ayala-Ocasio had worked with Appellant for one or two years. Mr. Ayala-Ocasio testified that Mr. Rivera-Aguirre and Appellant arrived around the same time as he had (approximately 10:30 in the evening), and that Mr. Rivera-Aguirre and Appellant had arrived in the same vehicle. Mr. Ayala-Ocasio did not park in the Jet Set parking lot, but instead parked in the back alley behind it. The men all entered the Jet Set together.

[8] Not to be confused with Victim, Jose Rivera.

Around 11 p.m. Appellant and Jose Rivera-Aguire told Mr. Ayala-Ocasio that there was a "problem." With respect to the "problem", Mr. Ayala-Ocasio testified as follows:

Witness: Everything was normal at the moment, around 11 [p. m.], Jose Rivera (Aguirre) and Menor came to me. They offered me a beer. I told them yes. They went and they got buckets of beer. They put them on the table. I asked if they were okay. They told me yes. Sorry.

ADA Waterloo: And then what happened?

Witness: I asked Jose Rivera (Aguirre) if he was okay because I saw that he was somewhat intoxicated. He told me that, yes, that he was fine. Then they left. Sometime later Jose Rivera (Aguirre) came back to me, told me that he had a problem.

ADA Waterloo: How would you describe Jose Rivera-Aguirre's demeanor when he came back to you?

Witness: He looked somewhat upset.

ADA Waterloo: And was Menor or Luis Navedo with him at that time?

Witness: Yes.

ADA Waterloo:  And then what happened?

Witness:  He told me that, yes, that he was fine.  Then sometime later they left again, supposedly to check out women.  Then they returned.  And then were there and they have—kept talking about an issue, but he didn't tell me specifically who the person was that he had the issue with.

Mr. Ayala-Ocasio testified that although Appellant and Mr. Rivera-Aguirre would periodically leave the table, he remained at the table the whole time and did not see "the problem."  Around 1:45 a.m., Jose Rivera-Aguirre and Appellant told Mr. Ayala-Ocasio that they were leaving, and five minutes later Mr. Ayala-Ocasio also left.  Mr. Ayala-Ocasio was 30 to 40 feet behind Appellant and Mr. Rivera-Aguirre as they walked into the parking lot.  He testified that Appellant told him they were waiting for the person with whom they had had the "problem" inside.  He stated: "[T]hey were waiting for the person they had the problem with, that when they exited, they were going to fight, when these people were coming."  Mr. Ayala-Ocasio saw Mr. Rivera-Aguirre throw a bottle, and then he saw Appellant take out a gun and fire a total of 10 to 15 shots.

On redirect, Mr. Ayala-Ocasio reiterated that it was Appellant, Jose Navedo, known as "Menor", who fired a gun 10 to 15 times on Monday, September 3, 2012 in the parking lot of the Jet Set Bar & Restaurant.

\* \* \*

Commonwealth witness Martin Pena testified that he knows Appellant, and that he had seen him several times on September 3, 2013 at Appellant's residence at 241 South Sixth Street in the City of Reading, Pennsylvania.  He testified that Appellant was friends with Gilberto Delgado-Mendez and Giovanni Delgado-Santos, father and son.  Mr. Pena lived close enough to the Jet Set Bar & Restaurant that he could hear the shooting, and he testified that he had seen Appellant return home 15 to 20 minutes after the sound of gunshots, and that Appellant seemed "scared, desperate."  Mr. Pena explained that there is an abandoned property directly adjacent to Appellant's residence at 241 South Sixth

- 5 -

Street. When Mr. Pena went over to 241 South Sixth Street the day after the shooting, he saw that Appellant was there with Gilberto Delgado-Mendez and Giovanni Delgado-Santos, and Mr. Pena was in the room when the three men were having a conversation. Mr. Pena overheard Appellant say that he had done something "bad" and that he had to get out of the country fast. Mr. Pena testified as follows: "He said in street language, he was saying I wiped somebody out." Mr. Pena testified that he saw Appellant holding something white, like a sheet or towel, and he heard Appellant say, "put these away, hide them good." Mr. Pena testified further that Giovanni Delgado-Santos took the white object next door to the abandoned property. Mr. Pena further testified that Appellant told Giovanni Delgado-[Santos] that the object was actually guns, one handgun and one shotgun.

According to Mr. Pena, Appellant then asked the men for money, and that they gave Appellant money. Finally, Mr. Pena observed Appellant leave 241 South Sixth Street and enter the car of a Mr. Luis Velasquez, who lived a few houses up the street from 241 South Sixth Street. After witnessing all of this, Mr. Pena contacted Criminal Investigator Kevin Maser of the Reading Police Department.

…Commonwealth witness, and Criminal Investigator, Michael Perkins, … testified at trial that he had executed a search warrant on 239 South Sixth Street, which is the abandoned property described by Mr. Pena, separated only by a badly dilapidated fence from Appellant's residence at 241 South Sixth Street. The structure of 239 South Sixth Street was deteriorated to the point that the rear exterior wall of the building had collapsed.

The search of 239 South Sixth Street took place on September 4, 2012 at 3:13 a.m., just over 24 hours after the shooting. During the search, C.I. Perkins noticed part of a gun stating: "what I initially noticed was the butt stock of some kind of rifle." C.I. Perkins testified that he "also noted that there was a clean white shirt next to the butt stock of the unknown weapon." He further observed that the house was filthy and in deplorable condition, but the white tee shirt was clean. Inside the shirt was a handgun, which was determined to be a black and silver

- 6 -

semiautomatic Springfield Army 9mm, along with a box of ammunition.

Commonwealth Witness Pennsylvania State Police Corporal Mark A. Garrett, who works in the Bureau of Forensic Services in the Ballistics Division, was qualified at trial as an expert witness in the area of firearms and tool mark analysis. He testified that the 19 discharged cartridges recovered from the scene at the Jet Set Bar & Restaurant were all discharged from the Springfield 9mm handgun recovered from 239 South Sixth Street.... He further testified that the 14 bullets and/or bullet fragments recovered from the scene … are consistent with the 9mm semiautomatic firearm recovered from 239 South Sixth Street.

\* \* \*

Criminal Investigator Eric Dreisbach of the Reading Police Department testified that he had obtained Appellant's cell phone number from Commonwealth Witness Martin Pena. Employing a cell-phone-locating technique known as "pinging," C.I. Driesbach was able to determine that, as of approximately 4 a.m. on September 4, 2012, Appellant's cell phone was "within 1855 meters of the Philadelphia International Airport." C.I. Driesbach continued to "ping" Appellant's cell phone at 30-minute intervals, each time receiving the same result.… After a period where no information was received from Appellant's cell phone, there was a final "ping" received from the phone which took place around noon on September 4, 2012. This indicated that Appellant's cell phone was in Puerto Rico.

Further, [C.I.] Dreisbach testified that he was able to verify that Luis Velasquez is the registered owner of a Chevrolet Impala, which is the car Martin Pena testified he saw Luis Velasquez driving Appellant in the day after the shooting. C.I. Dreisbach obtained Luis Velasquez's phone number from one of his roommates, and a review of the Sprint cell phone records indicated that Mr. Velasquez's phone and Appellant's phone interacted six times between September 3, 2012 and September 6, 2012.

(Trial Court Opinion, filed 4/13/22, at 4-12) (internal citations and some

footnotes omitted).

Justin Uczynski, a Reading police officer, testified that he interviewed a Jet Set patron named Marianne Marrero on the night of the shooting. According to his report, Ms. Marerro stated that she had seen a man in a black t-shirt get out of a red jeep and apologize for "scraping it," which she understood to mean that an accident had taken place in the parking lot. After this, she saw a Hispanic male in a white shirt with turquoise horizontal stripes shoot at the man that exited the jeep. Ms. Marerro did not see the face of the shooter. When called to testify, Ms. Marerro did not recall providing these details to the police on the night of the shooting and reiterated that she did not see the shooter's face.

Officer John Solecki, a Reading police sergeant, testified that he interviewed a Jet Set security officer named Marilyn Santiago on the night of the shooting. Ms. Santiago reported that she overheard a Hispanic male in a white polo with blue horizontal stripes on the phone saying, "We will open the gates to heaven." Ms. Santiago interpreted this to mean that someone would die that night, and she contacted other security personnel anticipating trouble outside of the club. Officer Solecki presented Ms. Santiago with a photo lineup, and Ms. Santiago indicated that the individual she heard make this statement was Ilfrin Moncion-Perez. Ms. Santiago did not report seeing Mr. Moncion-Perez in possession of a firearm. Brian Adler, a Reading police officer, testified that he detained Mr. Moncion-Perez shortly after the shooting

and searched him for weapons. Officer Adler did not find any weapons on Mr. Moncion-Perez's person and released him after he explained that he was in the parking lot looking for his sister-in-law.

Mr. Delgado-Mendez testified that he lives at 241 South Sixth Street and knows Appellant as "Menor." Mr. Delgado-Mendez stated that he has seen Appellant hang out on his street, but Appellant has never been inside his house. Mr. Delgado-Mendez denied hearing Appellant confess to shooting anyone or giving Appellant money to go to Puerto Rico. Mr. Delgado-Mendez confirmed that Luis Velazquez lives on his street and drives a Chevrolet Impala but denied seeing Appellant leave for the airport with Mr. Velazquez. Mr. Delgado-Santos testified that he recognized Appellant but did not know him or his name. He further stated that Appellant did not confess to killing anyone in his presence and did not give him a firearm to hide.

Emily Navedo, Appellant's sister, testified that Appellant had a close relationship with their grandmother who resided in Puerto Rico. She stated that their grandmother was diagnosed with cancer in the summer of 2012 and was suffering from cognitive decline. When their father requested help to take care of their grandmother, they decided that Appellant would go to Puerto Rico. Ms. Navedo learned that Appellant went to Puerto Rico on the day after he arrived when he called her and asked her to pick up his check from work.

On March 21, 2014, a jury convicted Appellant of first-degree murder, attempted first-degree murder, two counts of aggravated assault, two counts

of aggravated assault with a deadly weapon and possessing instruments of crime. The trial court sentenced Appellant to life imprisonment on May 16, 2014. This Court affirmed the judgment of sentence on April 1, 2015, and our Supreme Court denied allowance of appeal on March 23, 2016. **See Commonwealth v Navedo**, No. 959 MDA 2014 (Pa.Super. April 1, 2015) (unpublished memorandum), *appeal denied*, 635 Pa. 752, 135 A.3d 585 (2016). On January 9, 2017, Appellant filed a petition under the Post Conviction Relief Act[2] ("PCRA") raising allegations of ineffective assistance of counsel, including counsel's failure to file post-sentence motions. The PCRA court entered an order reinstating Appellant's post-sentence rights and direct appeal rights *nunc pro tunc* on November 9, 2021.

On November 19, 2021, Appellant filed a post-sentence motion which was denied on January 20, 2022. Appellant filed a timely notice of appeal on February 22, 2022. On March 17, 2022, the court ordered Appellant to file a concise statement pursuant to Pa.R.A.P. 1925(b) and Appellant timely complied on March 31, 2022.

Appellant raises the following issue for our review:

> Whether the trial court reversibly erred in denying [Appellant]'s post sentence challenge to the weight of the evidence where the evidence of the defense witnesses and/or statements of Marriane Marrero, Marilyn Duval, Gilberto Delgado-Mendez, Giovanni Delgado-Santos, Emily Navedo and other clearly outweighed the evidence of the prosecution?

---

[2] 42 Pa.C.S.A. §§ 9541-9546.

(Appellant's Brief at 5).

On appeal, Appellant contends that there was no reliable evidence identifying him as the shooter or connecting him to the recovered gun. Specifically, Appellant claims that Mr. Ayala-Ocasio's testimony was not credible because there were inconsistencies between his account and the accounts given by other witnesses. Appellant further avers that it was unclear whether Mr. Ayala-Ocasio was speaking about Victim Jose Rivera or Jose Rivera-Aguirre in his testimony because he interchangeably used the names "Jose Rivera," "Jose A. Rivera," and "Jose Rivera-Aguirre" on different occasions. Additionally, Appellant asserts that Mr. Ayala-Ocasio's motivations are questionable because he admitted that he was previously convicted of identity theft and is a Commonwealth witness in three other pending murder cases. Appellant further asserts that Mr. Pena's testimony was contradicted by the unimpeached testimony of Mr. Delgado-Mendez and Mr. Delgado-Santos. Appellant states that Ms. Navedo's testimony established that Appellant went to Puerto Rico for reasons completely unrelated to the shooting. Therefore, Appellant concludes that the jury's verdict was against the great weight of the evidence because there was no reliable evidence connecting Appellant to the shooting, and we must vacate the judgment of sentence. We disagree.

When examining a challenge to the weight of the evidence, our standard of review is as follows:

- 11 -

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the...verdict if it is so contrary to the evidence as to shock one's sense of justice.
>
> Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Champney*, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (internal citations omitted). A "trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Commonwealth v. Rivera*, 603 Pa. 340, 363, 983 A.2d 1211, 1225 (2009), *cert. denied*, 560 U.S. 909, 130 S.Ct. 3282, 176 L.Ed.2d 1191 (2010).

Instantly, the court found that Appellant failed to establish that the evidence was overwhelmingly contrary to the verdict. Mr. Ayala-Ocasio was the only person who testified that he saw the shooter's face. Although other witnesses reported seeing a man in a white and turquoise/blue shirt, none of those witnesses reported seeing the shooter's face or recalled the details of the night when testifying. The Commonwealth also produced evidence that the man identified by these witnesses was detained on the night of the shooting and no weapons were found on his person. Additionally, regardless of how Mr. Ayala-Ocasio referred to Mr. Rivera-Aguirre, there was no

uncertainty about Mr. Ayala-Ocasio's testimony regarding Appellant. Mr. Ayala-Ocasio stated that he knew Appellant, was with Appellant at the bar for part of the night, and witnessed Appellant take out a gun and fire 10 to 15 shots in the parking lot.

Further, even though Mr. Pena's testimony was contradicted by Mr. Delgado-Mendez and Mr. Delgado-Santos, C.I. Perkins corroborated Mr. Pena's statements. C.I. Perkins testified that he recovered a rifle and handgun in the location described by Mr. Pena just over 24 hours after the shooting. C.I. Dreisbach also corroborated Mr. Pena's testimony by confirming that Luis Velazquez owns a Chevrolet Impala and had multiple calls from Appellant's phone in the days immediately following the shooting. In addition, although Appellant may have had a legitimate reason to visit Puerto Rico, the Commonwealth presented evidence showing that Appellant departed suddenly without informing his family, purchasing a ticket in advance, or collecting his paycheck. The court also noted that the jury was made aware of any potential bias or improper motivation behind the Commonwealth witnesses' testimony, and it was free to consider those facts in weighing their credibility.

Based on the foregoing, we agree with the court that the inconsistencies and conflicting testimony noted by Appellant do not outweigh Mr. Ayala-Ocasio's direct testimony that he witnessed Appellant fire a gun in the Jet Set parking lot, Mr. Pena's corroborated testimony that Appellant attempted to hide the murder weapon, and the questionable circumstances under which

Appellant fled to Puerto Rico. Accordingly, we discern no error in the court's determination that the jury's verdict does not shock the conscience. **See Champney, supra**. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/20/2023